## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Manuel Tijerino | ) CIVIL ACTION NO |
| Plaintiff, | ) |
| | ) 2:24-cv-02290-ILRL-DPC |
| | ) SECTION "B" (3) |
| | ) |
| Versus | ) DISTRICT JUDGE |
| | ) HON. JUDGE IVAN L.R.LEMELLE |
| | ) |
| Spotify USA Inc. ET, AL. | ) MAGISTRATE JUDGE |
| | ) HON. MAGISTRATE JUDGE DONNA |
| | ) PHILLIPS CURRAULT |
| | ) |
| | ) |

## AMMENDED COMPLAINT

COMES NOW, Plaintiff, Manuel Tijerino ("Plaintiff" or "Tijerino" or "I") a resident of Jefferson Parish Louisiana, brings this action against Defendant Spotify USA Inc. a corporation out of New York ("Defendant" or "Spotify") for infringement of U.S. Patent No. 9,146,925 ("the '925 Patent"), issued on September 29, 2015, covers Tijerino's innovative invention, "User-Defined Internet Jukebox", which allows artists to self-publish and distribute their music worldwide via an internet jukebox system.

### I. Jurisdiction and Venue

This action arises under the patent laws of the United States. 35 U.S.C. § 1 et seq. This

Court has jurisdiction pursuant to federal question 28 U.S.C § 1311 and any civil action arising under Act of Congress relating to patents 28 U.S.C § 1338(a) and any action asserting unfair competition U.S.C. § 1338(b). Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), (c), and 1400(b) because Spotify USA Inc. has a substantial presence and conducts business in this district. In addition, the amount in controversy exceeds $75,000, excluding interest and costs, in accordance with 28 U.S.C. § 1332.

Venue is proper under this district under 28 U.S.C. § 1400 (b)(2) because the defendant committed acts of infringement in Louisiana during 2018 and 2019. Specifically, Defendants enabled artist from Louisiana to upload and distribute their media though Defendant's platforms, while retaining 50% of the revenue generated by those artists. This revenue was directly tied to the services offered by Defendant through the "Spotify for Artist" platform. Infringement persists today via the doctrine of equivalence.

The fact that infringing acts occurred in Louisina, coupled with the generation of substantial revenue from services offered in this state, establishes that the Defendant conducted significant business activities within Louisiana. These actions fall within Louisiana's legal jurisdiction. (See Exhibit M).

By engaging in business transactions within the forum state, the Defendants established minimum contracts with Louisiana. As such, Louisiana's long-arm statue La. Rev. Stat. § 13:3201 give this court personal jurisdiction over foreign (out-of-state) defendants

who have sufficient minimum contacts with the state, for activities that involve patent infringement and harm residents of Louisiana. Accordingly, this Court is the proper venue for this action under the patent laws.

## II. Facts

Tijerino developed the '925 Patent to enable any artists to upload and distribute their music globally though an internet jukebox. Tijerino filed U.S. Patent Application No. 12/804,665 on July 27, 2010, and receiving the '925 Patent on September 29, 2015. Spotify launched its "Spotify for Artists" program in December 2013, which includes features similar to those covered by the '925 Patent. Despite Tijerino's letter dated July 11, 2024 inviting Spotify to license the patent, and a reminder sent on August 13, 2024, Spotify did not responded substantively, promoting this action.

## III. Definitions And Scope

**Honorable Court**

Plaintiff respectfully asks the court to recognize the authority granted by the United States Constitution, specifically Article I, Section 8, Clause 8. This clause, known as the "Patent Clause," aims "to promote the Progress of Science and useful Arts." It does so by granting authors and inventors exclusive rights to their creation for a limited time. In view of this important principle, Plaintiff urges the court to uphold these rights and support innovation an progress in our growing nation.

**Discussion of the Patented Concept And Prior Art**

The United States Patent and Trademark Office issued '925 Patent, entitled "User Defines Internet Jukebox Kiosk SetTopBox," on September 29, 2015; published approximately 14 years ago and discloses a Web 2.0 jukebox method and system that allows musicians to gain exposure and earn money in public places. The invention allowing any artist to self promote their media via "a system of "jukebox". The "inventive step" being the ability self distribute described as "realtime media distribution of new media". This invention originated as a platform for artist, isolated from the music industry, and gracefully blossomed into a bridge uniting artists with the industry through PRO licensing. The prior art, internet-jukeboxes supported the concept of "realtime media distribution" but were non-inclusive of  the artist, lacking distribution "for new media". The inventive step of our claim 1 "for new media" provided artist an opportunity for distributing their music to the general public via "a system and method of jukebox" known today as "**for Artist**". The purpose of the invention, as stated in the patent is to provide musicians with exposure and income opportunities in public spaces, with a reasonable goal of maximizing exposure and revenue for musicians. (See Discussion on Public Venues)

**DEPENDENT CLAIMS**

Staring with our dependent claims 2, 14, 16. **2**. The method of claim 1, wherein media comprises images, video and music. **14**. The method of claim 1, where in the jukebox is

"at least one of" computer device, and internet jukebox, kiosk, set-top-box, or cell phone. **16**. The method of claim 1 wherein the wide area network is the Internet.

As supported in our detailed Claims Chart from out original complaint (Doc 1-4 ) (Exhibit C); refereed herein as "CH" with the page number as a numeric value. Therefore (CH-1) means the (claims chart page 1);

**ALLEGATIONS**

Plaintiff asserts that Spotify infringed upon our '925 patent by directly infringing every element of independent claims 1 and 3. This infringement occurred when Spotify offered direct uploads via the Spotify for Artist platform to artists in Louisiana, during the term of our patent, around 2018-2019. Detailed explanation of how element of claims 1 and 3 were directly infringed are provided below, and further supported in Exhibit M .

In addition to direct infringement, Plaintiff further alleges that Spotify knowingly continues to infringe upon our '925 patent. Spotify attempts to circumvent our patent by restructuring its structure and offloading infringing activities for their Spotify for Artist platform to third-party partners that may possibly not be aware. These actions constitute continued direct infringement. Spotify's ongoing collaboration with these partners support and promote activities that still infringe every element of out claims 1 and 3, as detailed in the patent, and are equivalent to when they were directly infringing.

**DIRECT INFRINGMENT**

1. <u>A computer implemented method for real time music distribution of new media for allowing an artist to control availability of the new media for playback in public venues via a jukebox, the method comprising:</u>

3. <u>A non transitory computer-readable media embodying program instruction for execution by a computer, the program instructions adapting the computer for real time music distribution of new media to allow and artist to control availability of new media for playback in public venues via a jukebox, the program instructions comprising:</u>

1. <u>a computer implemented method</u>

3. <u>A non transitory computer-readable media embodying program instruction for execution by a computer, the program instructions adapting the computer</u>

describes in (CH-1) as "<u>Spotify for Artist</u>" is a system both <u>1. a computer implemented method,</u> and <u>3. a non transitory computer-readable media embodying program instruction for execution by a computer, the program instructions adapting the computer;</u>

1. <u>for real time music distribution of new media</u>

3. <u>for realtime media distribution of new media</u>

The included (exhibit M) demonstrates how **Spotify For Artists**, senior product lead told Billboard on September 20, 2018 there will be "no limit or constraint on how often" they can upload... for artists to begin sharing their music to their fans on Spotify,

demonstrating real time media distribution directly on Spotify.

1. <u>for allowing</u>

3. <u>to allowing</u>

Claim 1 and 3 describe **for allowing**, and **to allowing**, defendant system allows, <u>an artist</u> <u>to control availability of new media</u> "no limit or constraint on how often", <u>for playback</u> <u>in public venues</u> the claims chart describes "400+ million listeners in 184 markets", and as a public venue; Nowhere does the '925 patent describe a private venue, nor does it limit, anywhere in the claims, a "public venue" to be a specific type of location, such as a bar. In fact, Copyright laws requires any medium transmitted to the public to pay artist when music is being performed publicly, <u>via a jukebox</u> as specifically claimed 14. The method of claim 1, where in the jukebox is **at least one of** (see **Dependent Claim 14 And Meaning Of "Jukebox" below**) computer device, and internet jukebox, kiosk, set-top-box, or cell phone, which '925 claim 14. widens the scope, and as such the detailed description discloses other devices and versions of jukeboxes, iPhones and Androids, Tv's, as well as illustrations of code for Plaintiff's very own math formula for creating resizable user interfaces demonstrating a 1 inch screens jukebox and real time-audio encoding similar to the standardized ones. The '925 patent also specifies Other versions of the jukebox **3** run on cell phones. Spotify, who is also on different devices, as well such as cell phone TVs and the claims char demonstrates a web player jukebox and the social media as the venue, and Spotify describes when you cast it to your TV you

essentially turn your Tv into a jukebox and describes supporting cars, game consoles, and smart watches, and smart watches which have 1 inch screens. The '925 patent describes the backend (system) **2** will be composed of servers, databases and web programs what will handle storage, and updates to the members accounts and foremost their media. **2.** The method of claim 1 wherein media comprises images, video and music. As such the server is part of the system and method for allowing the disclosed utility:

1. <u>the method comprising:</u>

3. <u>the program instructions comprising:</u>

The method of the **1** spirit and the programing instruction of the **3** embodiment, the sprit embodying the physical, made the '925 patent tangible and patentable, as required by 2014 Supreme Court decision for software systems, "*Alice Corp. v. CLS Bank International, 573 U.S. 208*". As such, the the defendant engaged in direct infringing activities while the patent remains enforceable. (See Exhibit M).

(**This element of claim 1 and 3 is infringed,** because the defendants system provides these capabilities).

**The methods consisting of:**

1. <u>providing, by a processor, a user interface to interact with a system;</u>

3. <u>providing a user interface for authoring of media;</u>

CH-9 demonstrates defendant giving providing a user interface to interact with their system for authoring new media. This fundamental step serves as the gateway for uses to engage with the system. By providing a user interface though a processor, the system becomes accessible. This interaction is essential for ensuring that users can easily create, control and manage the account. The user interface acts as a bridge between the user and the system's capabilities, making the overall process user-friendly and accessible. (**This element of claim 1 and 3 is infringed** because the defendant provides the user a user interface to interact with the system.)

1. providing, by the processor, a user interface to add the user to the system;

3. providing a user interface to add the user to the system.

CH-10 demonstrates the defendant providing a user interface to add a user to the system. This fundamental step establishes the user's identity and permissions within the system. By offering a user interface to add the user to the system, the processor enables personalized access and interaction. (**This element of the claim 1 and 3 is infringed** because the defendant provides a user interface for the user to create a user account).

1. providing, by the processor, a user interface to create an account;

3. providing a user interface to create and account;

CH-9 Demonstrates the defendant providing a user interface to create an account (+Add Artist button). This step is fundamental as it enables users to establishes account identity

in the service. Account creation is the cornerstone for personalized user experience and effectively management of content distribution. (**This element of the claim 1 and 3 is infringed** because the defendant provides a user interface allowing a user to create an account).

1. providing, by the processor, a user interface to log into the system;

3. providing a user interface to log into the system;

CH-9 Spotify demonstrates providing a user interface to log into the system. This step is crucial as it enables users to access their personalized space within the system. By providing a user interface to log into the system, the processor ensures that each user can securely enter their credentials, such as usernames and password, to verify their identity. (**This element of the claim 1 and 3** is infringed because the defendant provides a user interface for the user to log into the system).

1. providing, by the processor, a user interface to add the new media to the system,

3. providing a user interface to add the new media to the system,

   CH-12 demonstrates defendant allowing artist to add new media to the system for a release. CH-13. demonstrates the release album, image and the tracks. (**This element of the claim 1 and 3 is infringed** the defendant provides a user interface to add the new media to the system).

1. wherein the new media is not previously stored in the system;

3. wherein the new media is not previously stored in the system;

The media is now on the server system. CH-13 demonstrates defendant system now having new media that was not previously stored in the system. When you upload media to a server (cloud means the same) the media was not previously on the server system. (**This element of the claim 1 and 3 is infringed** because before the upload of the new media the new media is not previously store in the system).

1. receiving by the processor, the new media added to the system;

3. receiving the new media added to the system;

CH-12/13 demonstrates defendant has added new media to a the system. This step is fundamental but crucial because the new media is now part of the system, as opposed to before being added it was not part of the system. (**This element of the claim 1 and 3 is infringed** because new media added to the system becomes part of the system).

1. automatically identifying, by the processor, metadata for the new media and storing the metadata in a database.

3. automatically identifying metadata for the new media and storing the metadata in a database,

**Info:** (Metadata is essentially data about data. It provides essential information that helps describe and manage other data. In the context of digital media, metadata can include title, artist name, album name, track number, genre, release date, and duration of

song.) CH-14. demonstrates the defendant demonstrating how their system collects metadata in the collection of information that pertains to a song file. And this step is crucial because, automatically identifying and storing metadata not only streamlines media management but also enhances the access and improves content organization.

 (**This element of the claim 1 and 3 is infringed** because defendant collects metadata and stores in a database.)

1. storing, by the processor, the new media in a central storage device, wherein the storing automatically enables the new media to be requested by the jukebox for playback over the internet by providing to a client software installed on the jukebox, access to the database storing the metadata for the new media, via an API call over the Internet;

3. storing the new media in a central storage device, wherein the storing automatically enables the new media to be requested by the jukebox for playback over the internet by providing to a client software installed on the jukebox, access to the database storing the metadata for the new media, via an API call over the Internet;

This one was a little tricky to explain, but if we glance at all the claims from a higher level and ignore the two audio processing claims after this one, we see the one saing, "providing metadata for the new media over the internet in response to the API call for display by the jukebox", that claim element where is where we star explaining what happens when the server starts reviving request for metadata associated with the new

media, here in this claim, we simply explain on a high level how the server (application code), automatically(programmatically) enables (map entity objects), allowing the new m e d i a **metadata** to be accessible through an API, without going into great implementation details, and without any constraints or limitation on time). Here we provide some general programming concept definitions to help explain this further.

**Info:** (Entity-object is a term often used in the context of databases and object-relational mapping(ORM). It represent a real-world object or concept(like a file, user, or product) in a database. **An entity object contains attributes** (like **metadata for a file**) and a way to map data from the database to the application code.)

**Info:** (Automatically, with reference to a device or **process**) **by itself** with little or no direct human control.)

**Info:** (Programmatically is used to refer to **tasks that can be done in an automated way** (using such **programs**), especially as opposed to tasks that have to be done manually (by a person)).

**Info:** (**Enable**, give (someone or **something**) the **authority** to means **to do something**. Similar: authorize, allow, permit, Computing: **make** (a devise or **system**) **operational**; **activate**.)

**Info:** (In a computer you have two types of data, **character** data, and **binary** data).

(As previously explained when we uploaded the file, extracted metadata (**character**

13

data) goes into the database but the new media file (**binary** data) in a central storage device.)

1. storing, by the processor, the new media in a central storage device,

3. storing the new media in a central storage device,

**Info:** (In object-oriented programming (OOP), the goal is often to model your data based on real-world **entities** and how you intend to interact with them. This involves creating classes that encapsulate data (attributes) and behavior (methods), relevant to what you're trying to represent. (e.g, Artist, Album, Track)).

**Info:** (A POJO, or Plain Old Java Object, is a very simple Java class that only has getters and setters and fields. You can use them to map to a database, and create **entities**. One example provided in the description was virtual albums, but here's some basic examples so you can get an idea of what sort of attributes entities can contain for a virtual album. e.g, Album (album_id, image_id, title, num_disk, added...) e.g, AlbumTrack (album_id, track_id, disk, position_on_disk...) e.g, ArtisAlbum(artist_id, album_id, album_order...), e.g. Artist(id, name, genre, bio, ...), e.g Metadata(title, artist, album, year, duration...), e.g Track(id, title, file_path, play_time, date_added, volume(perceived_loudness)...).

**Info: (**An Application Software Interface (API) is a set of rules and protocols that allow different software applications to communicate with each other. It defines the methods

and data formats that applications can use to interact with a systems features or data.)

**Info:** (A general example: In the context of databases and storage systems, this **relationship** is often implemented using a unique identifies, such as a file ID or a metadata ID, which serves a key to **associate** the file with its metadata. Where this metadata and file can be retrieved by the system and API, this setup allows the API to access the file thought its metadata or vice versa. In database terminology, which could be viewed as a "reference", and in some cases, it may involve creating a "foreign key" **relationship** if the metadata is stored in a relational database. But in a broader sense, it's all about maintaining a logical connection that allows for easy retrieval of the file and its **associated** metadata.).

**Info:** (**Character data** represents tests or symbols typically used in computing encoding to encode-human readable information. In programming and data management, character data is stored as a sequence of characters, such as letters, digits, and symbols, and can be represented in various encoding standards like ASCII or UTF-8).

**Info:** (In Java, a **String object** is an instance of the **String class**, which represents a sequence of **characters**.)

**Info:** (Both **JSON** (JavaScript Object Notation) and **XML** (eXtensible Markup Language) are text-based formats and are represented as strings.)

The patent description supports this. (Once the service retrieves the data from the

database through the dao's based on search criteria it will encode **just the metadata** and return it in a commonly used format such as **xml** or **json**.)

**Info:** (A noSql databases gained popularity for the ability to store formats such as JSON, and many other things such as flexibility, scalability, performance, document-oriented storage, and being developer friendly).

In the claims, we specifically mention "**database**", a term that encompasses a broader range of data management systems beyond just relational or NoSQL types. This broader terminology ensures we cover a wider scope of database technologies, addressing a more diverse array of data storage solutions."

The patent description supports, the file was saved to the file system, and also supports the concept of creating virtual albums and **associating** their media with those albums. Patent description supports (Behind the scenes section.... explaining (the restful web service API) contains DAO's that call the metadata stored in the database).

1. wherein the storing automatically enables the new media to be requested

3. wherein the storing automatically enables the new media to be requested

**Info:** (**Data association** during storage would typically involves somethings such as (when you upload a file and extract metadata and store in database, and store the file in file storage, programmatically **enables,** entity objects **associations** created in database allowing **DAO** access), implementation specific details we left out but are common and

reasonable to anyone skilled in the art of web based software development).

1 . by the jukebox for playback over the internet by providing to a client software installed on the jukebox

3 . by the jukebox for playback over the internet by providing to a client software installed on the jukebox

**Info:** (An API endpoint is a specific URL or URL path where you can access a function or service provided by an API (Application Programming Interface). Think of it like a doorway where you send request (such as for data or actions) to the service and receive a response. Web services are essential for websites, enabling apps to retrieve and interact with data.)

**Info:** (Client-Software is any software that interacts with an API though its endpoints. Client-Software refers to a program or application that runs on a end-user device (such as a computer, smartphone, or tablet) and can communicate with a server to perform specific tasks or retrieve data, however end-use of client software can technically be another piece of software, including server-side code. Servers often run code that acts as clients to other services, for example, a server application might use an API to fetch data from another server or cloud service, since the "jukebox" can technically mean anything according to claim **14** and we really did not claim any implementation details and it can be reasonably be interpreted to mean from within the server from outside the server from

a client running inside the server through web versions of the jukebox where you just uploaded your song. Conceptually speaking, Internet connectivity can seem that client and servers are far away but any reasonable person that has seen error pages inside websites understands that when internet connectivity can go down from inside the website you were you were just using and the feature becomes unavailable.

But that's a deeper conversation since here this element only describes automatically **enabling,** storing new media in a central storage device, the system sets up the condition needed for new media to be requested, and the data access via and API that can possibly occur in the future or maybe even never if you never call the API for the data, we talk about the calling part in another element in a different claim below after the first two RMS elements. By storing new media in a central storage device, the system sets up the condition needed for the media to become accessible via API. Any reasonable person skilled in the art would understand that you are not going to rewrite your API every time you upload a track, and even the defendant themselves access api's when creating an album release, since the album release shows the metadata for the tracks.

New media comprising of (metadata stored in the database(character data)) and (file stored on the central storage device(binary data)) is automatically(programmatically), **enabled** to be requested (by some client software)

for playback over the internet by **providing** client software installed on the client,

1. <u>access to the database storing the metadata for the new media</u>

3. <u>access to the database storing the metadata for the new media</u>

**Info:** (In the context of software development, a DAO, or Data Access Object, is a design pattern that provides and abstract interface to access a database or other storage mediums.)

The patent description supports DAO (So basically you are just browsing the database through a restful web service. The restful web service contains Data Access Objects (dao)'s that will call the underlying metadata stored in the database. Also it's called the term, **restful** web service, is called **restful**, because it sits there for ever, until someone decides to call it.

1. <u>via an API call over the Internet</u>

3. <u>via an API call over the Internet</u>

**Info: (**A DAO is this context is a design pattern used to systematically and efficiently manage the data exchange between the application and its database or storage system, serving as a cornerstone for creating APIs that require data interaction.)

CH-22 Shows The Spotify Web Playback SKD (Javascript client software) which makes API calls over the Internet where the server provides through an API access to both types of data, binary and metadata.

1 . <u>wherein the storing automatically enables the new media to be requested by the</u>

jukebox for playback over the internet by providing to a client software installed on the jukebox,

3 . wherein the storing automatically enables the new media to be requested by the jukebox for playback over the internet by providing to a client software installed on the jukebox,

Storing automatically enables, means systems programmatically create a link between the new media and the metadata data, since we are describing what happens to the new media once it reaches the server, the new media and the metadata are associated with each other, and this association, **enables**, the new media data to accessible by software. The patent describes (The method and system draw together the capabilities of client and server side software, content syndication, and use of network protocols).

Whether defendant decides to automatically request for playback is beyond the scope of this element and explained in the other element, we explained it broadly for better protection so underlying implementation doesn't change the intention. To demonstrate an association, the presentation layer, CH-15-16 demonstrates Spotify for Artist stored media on the central storage device (server), wherein the storing automatically enabled the new media to be requested by (client software (software that consumes the API)) installed on the ..... jukebox (web browser **14**) via an API (Spotify API CH-18) call over the Internet. As visible in the create your release example CH-15 Spotify for Artist website is displaying the tracks for the new media. The new media comprising of

(metadata stored in the database) about the (file stored on the server) as such it **became available** for playback though metadata (data about the data), as evident by the Spotify API response, displaying the new media music metadata on the create your release page, however, being that metadata is (data about data) meaning it's not the actual media file just the file descriptors about the file. File descriptors (metadata) don't actually play the file they only describe, the file to play, you can't play metadata through a media player, you can use metadata to see information about the file, or use it to request a file described later. A higher level argument of a much higher scope such as (in case the defendant argue they don't release music instantly) is that, real-time processing is integral to any system or application where **timing** is critical, and **process control** is one of the many areas that rely on it. In the method of claim **1** and **3 real-time** media distribution of "new media" precise process control over the timing is essential, whether releasing music instantaneously or scheduling a future release, its still **real-time**. A such a system that releases music in the future still infringes.

The patent description explains the server side, explaining how the server receives, processes, and creates a response. The the restful we service contains Data Access Objects (DAO)'s that will call the underlying metadata stored in the database. **Once the service retrieves** the metadata though the DAO... it will encode **just the metadata** and return it in a commonly used format such as XML or JSON.

(**This element of the claim 1 and 3 is infringed** because when defendant stores the new

media in a central storage device (a server) the storing automatically(programmatically) **enables** the new media **metadata** to be requested for playback over the internet by **providing** client software installed on the jukebox(website) access to the metadata stored in the database).

1 . automatically analyzing, by the processor, audio signals of the new media for determining a root mean square (RMS) value, wherein the RMS value is further mathematically manipulated for obtaining a positive RMS value less than 1;

3 . automatically analyzing audio signals of the new media for determining a root mean square (RMS) value, wherein the RMS value is further mathematically manipulated for obtaining a positive RMS value less than 1;

"According to AI we arrived at a positive RMS value less than 1 as being a unique perspective on the loudness spectrum of your signal."

**Info:** (Root Mean Square (RMS) is a statistical math formula used to determine the effective value or magnitude of a varying signal. In the context of audio this formula is used to measure the average power intensity or loudness (amplitude) of an audio signal. It's calculated by squaring the amplitude of each sample finding the mean of the squares, and then taking the square root, yielding the RMS value. There are two possible types of analysis whole file and segment-based. In segment-based analysis the track is divided into smaller segments or frames, and RMS analysis is performed on segments. RMS

values are always positive because they are derived by squaring each sample which eliminates negative values. In digital audio, signals are commonly normalized so peak values are withing the range of -1 to 1. In such cases the RMS value often falls below one. The purpose of audio analyzation is to keep audio from peaking beyond safe levels. The analyzation insures the resulting an optimal and safe loudness. By analyzing and performing signal processing, platforms like Spotify ensure a universal pleasant and undistorted listening experience.)

**Info: (**Clipping, in the context of audio refers to the distortion that occurs when an audio signal exceeds the maximum level that can be represented in the digital or analog domain. This level is often referred to as 0dBFS in the digital realm, whee it represents the maximum level before the signal distorts.) (dBFS stands for "decibels relative to full scale". It is a unit of measurement used to quantify the amplitude of digital audio signals relative to the maximum possible level(full scale) that can be represented without distortion in a digital audio system. (Decibels(dB)): A logarithmic unit used to describe a ratio of values, often power intensity. In audio, it used to express differences in loudness or signal levels. (Full Scale(FS)): Refers to the maximum amplitude level digital systems can handle before clipping occurs. Clipping happens when the signal exceeds this maximum, causing distortion. (0dBFS): Indicates a signal at full scale, meaning it is at the maximum level that the system can handle without distortion. Any signal level above 0dBFS will be clipped, leading to distortion.)

**Info: (**Digital recordings typically represent audio signals using a normalized range between -1 and 1 because this provides a standardized and efficient way to encode and process audio data. Here is why this approach is commonly used: Normalization: Representing audio samples as floating-point numbers in the range -1 and 1 simplifies processing and manipulation. This normalized range is mathematically convenient and is commonly used in digital signal processing (DSP) algorithms. Uniform Representation: The range between -1 and 1 allows for consistent encoding that is independent of bit depth. Whether using 16-bit or 24-bit, or floating-point audio, the representation remains versatile and straightforward. Symmetry: The range is symmetrical around zero, which corresponds to silence. Positive and negative values represent the oscillations of the sound wave above and below the zero line which corresponds to the equilibrium of the waveform. Clipping: The threshold at 1 (or -1) in the normalized scale is analogous to the 0dbFS point in fixed-point representation, which is the maximum level before clipping.)

**Info:** (In the -1 to 1 range for audio representation, full scale corresponds to the maximum value before clipping occurs: 1 represents the peak positive amplitude. -1 represents the peak negative amplitude.)

**As an Example:** If you have an RMS value calculate it from and audio signal, and you subtract it from zero to turn it negative, then add it to 1, you are effectively inverting the perceived loudness. Original RMS Value: Represents the effective average power or

loudness of the signal. Negating the RMS: By subtracting the RMS value from zero, you are flipping the sign, making it negative. Adding to 1: By adding this negative value to 1, you are create a new value representing some form of "inverted" loudness. The new RMS value you have now calculated would represent a measure that shows how much lower the effective average loudness of the audio is from its maximum possible loudness (from the peak at 1). Essentially, it tells you by how much the average loudness falls short of it's peak. A lower value from this calculation indicates that the audio's effective power is far from the maximum power. This subtractive transformation inverts the standard understanding of RMS, turning it into a measure of "quietness" or "distance from peak loudness". This new RMS value, if still less than 1, essentially shows the proportionate level of reduction from absolute maximum loudness to the average level when scaled back up to 1. This method could conceptually be used to apply gain to a signal, albeit in a slightly indirect way. Here's how you could think about it: Understanding the Inverted RMS Value: The inverted RMS value you calculated represents how much quieter or "off-peak: the current signal is. This isn't a direct factor of gain but more an indication of loudness relative to peak. Applying Positive Gain: If you want to boost the signal towards the maximum possible amplitude, you can use this inverted measure as a guideline. However, directly adding this inverted value to every sample of the audio won't give you true gain increase; rather, you'd multiply the entire signal by a gain factor greater than 1 to achieve amplification. Applying Negative Gain:

Conversely, if you're looking to reduce the signal's amplitude, your inverted RMS doesn't directly give a negative gain factor. But knowing how quiet your signal is relative to peak could inform how much reduction you apply, typically by scaling the entire signal by a factor less than 1. Conceptually this process gives you insight into how far the effective volume is from maximum peak, hence guiding your gain adjustments either for boosting or attenuation. For actual processing: To increase gain, choose a multiplier greater than 1 and apply it across your signal. To decrease gain, choose a multiplier less than 1 and applying it across your signal. In real-world audio processing, using standard techniques for adjusting gain (like decibels or percentages of max amplitude) will offer more precision and control. However, **your calculated value gives you a unique perspective on the loudness spectrum of your signal**. Regardless of how defendant does it they use RMS and mathematically manipulate the value to obtain a loudness spectrum to know how to adjust the audio, and as such this element of the claim is infringed.

Any reasonable person skilled in the art, (audio engineer) understands that if you have an audio track that is peaking the waves get cut off and become square ruining speakers and sound harsh to your ears, giving you listener fautige, if you only turn up or down volume on clipping sound it is remains a clipping sound regardless of volume, and has no effect on the waves inside the safe listening range of -1 and 1.

CH-28/P29 demonstrate audio analysis and processing is performed by the defendant.

CH-28/29 demonstrates defendant loudness normalization balances soft and loud songs, creating a more balanced uniform experience. (**This element of the claim 1 and 3 is infringed** because defendant performed audio analysis on the signals of the new medias using RMS and performing mathematical calculations obtaining loudness spectrum of the signal).

1. storing by the processor, the obtained RMS value less than 1 as metadata for the new media;

3. storing the obtained RMS value less than 1 as metadata for the new media;

CH-19 demonstrates the audio analysands api of the processes media, stored by the processor. When tracks undergo the analysis that computes the loudness, dynamic range, and RMS value this analysis generates metadata that indicates how the track should be adjusted during playback. Rather than resaving or altering the original audio file Spotify uses metadata tags to inform how the audio should be applied to a tracks while playing, but as demonstrated it is stored on the server side. (**This element of the claim 1 and 3 is infringed** because defendant stores audio analysis metadata).

1. providing by the processor, the metadata for the new media over the internet in **response** to the API call for display by the jukebox;

3. providing metadata for the new media over the internet in **response** to the API call for display by the jukebox;

27

We gave a bunch of explanation above to get an understanding of automatically enabling, here we finally reach the point where can explain how the server responds, to an API call (request). It responds by providing metadata about the new media that was previously automatically enabled.

CH-21 Spotify server provides metadata for the new media, through the Spotify Web API over the internet, in response to and API call from the client Spotify Web API, and demonstrates this capability from their service as seen on Tv(Jukebox). "This type of metadata is what allows you to turn your TV into a jukebox." In the provided example ChromeCast as a set-top-box middleware with the Spotify Web API has capability to call the Spotify API end point over the Internet, when it does the server responds with "new media" metadata in response the the API call for display by the connected Tv jukebox(Tv), demonstrating spottily service through it's Spotify API served up new media metadata providing "new media" metadata over API calls. Spotify demonstrate their service has a capability to a response to API calls over the Internet providing similar functionality, and as such.

(**This element of the claim 1 and 3 is infringed** because defendants demonstrate their system has an API that responds from client request, returning metadata of the new media over the Internet).

1. <u>receiving by the processor, a **request** from the jukebox for playback of the new media associated with the displayed metadata;</u>

28

3. receiving a **request** from the jukebox for playback of the new media associated with the displayed metadata;

**Tip:** (The words **request response** are highlighted showing that server receives request and then server responds.) (See Discussion on Request Response below).

In this element CH-22 demonstrates Spotify server serving new media when Spotify Web Playback SDK a Javascript Library (client software) capable of making request contacts the server requesting new media.

(**This element of the claim 1 and 3 is infringed** because server is capable of receiving a request requesting of new media associated with displayed metadata);.

1. in **response** to the request, streaming by the processor the requested new media to the jukebox for playing audio corresponding to the streamed portion of the new media;

3. in **response** to the request, streaming the requested new media to the jukebox for playing audio corresponding to the streamed portion of the new media;

CH-23 demonstrates the Spotify server is capable of responding to the request by and capable of streaming **new media** through the Spotify SKD (client software).

**Info:** (Streaming is a technology that allows continuous transmission of audio, video, or other media files over the Internet, without needing to download entire file before playing it. Streaming also does not require you store the files locally, you do not have to worry about storage space. Any reasonable person that understand streaming knows

Spotify is known for streaming)

(**This element of the claim 1 and 3 is infringed** because Spotify server streams new media in response to a request by the client.).

1. automatically calculating, by the processor, amounts earned by an artist and a venue playing the new media; and

3. automatically calculating, by the processor, amounts earned by an artist and a venue playing the new media; and

These elements of claim **1** and **3** are identical. In this element of the claim the server tracks music usage providing income opportunities for artists through the PROs. This element of the claim bridges the inventive step of real-time media distribution "for new media" between artist and the music industry. PROs pay the artist all we do here is calculate what played where.

In my claim, "venues" refer to "territories", the different legal jurisdiction related to PRO licensing (ASCAP licensing), although these terms are explicitly interpreted withing the context of my patent description and my exhibit in the licensing terms on the complaint. (See Doc 1-5 Exhibit I). Demonstrates PRO license terms, 1.14 "Territory" means the United States of America, it's territories, dependencies and possessions and the Commonwealth of Puerto Rico." This proves that PRO licensing is territorial.

A notable things to notice as well is the location of this element, describing process of

the server responding to a streaming request. The patent description also supports this in same location.

(Now you have to go through a web service to get the file from the system. The web service helps track usage and session tracking to keep compliance with ASCAP licensing for popular music...).

**Info:** (Performance rights organizations (PRO) also know a performance rights societies, provide intermediary functions, particularly collection of royalties between copyright holders and parties who wish to use copyrighted works publicly. In the U.S we have ASCAP, BMI, SESAC, and GMR for partial licensing, and Canada has SOCAN, and Germany has GEMA as different venues and territories have different PROs. Since Pro music licensing is territorial through the world, when you obtain permission from the PROs to licensing for popular music you to must report royalties(earnings)c calculations for the territory(venue), involves automatically calculating (artist)**what** played (venue)**where**.). Any reasonable person reporting royalties to the pros know the licenses are territorial and you submit music use reports.  The focus of the patent is on automatic calculations, not manual ones. This distinction is crucial, as manual calculations in this context would be unreasonable and impractical. The defendant's themselves acknowledge the role of automatic calculations in their royalty reporting process, which aligns with patent's claims. And the defendant also acknowledged in their answer what they understand what we are describing in claim 1 and 3 the automatic

calculation "limitation" a term they made up, "At most, the screenshots relate to calculating streaming royalty payments to music right holders".

(**This element of the claim 1 and 3 is infringed** because Spotify automatically calculated royalties, performing music use reporting, for artist to get paid while our patent was active (Exhibit M)).

1. <u>receiving, by the processor, indications of payment of the amount earned,</u>

3. <u>receiving, by the processor, indications of payment of the amount earned,</u>

These elements of claim 1 and 3 are identical. The patent supports (the website helps to track usage and session tracking to keep in compliance with ASCAP licensing) and (artists get paid royalties every time their media plays). Any reasonable person doing music use reporting knows that artist get paid by the PROs, and is unknown to the music distribution services reporting. Music use reporting entails tallying each performance and some time later reporting it to the PROs. For the last 15 years Plaintiff reported quarterly. Since reporting is automated (calculating(previous element) and receiving) both occur the server(cloud) side. In this element of the claim the processor receives indication of the performance royalty earned since you have to tally it to properly report. The defendant previously acknowledged in their answer to our original complaint they understand what we are describing in claim 1 and 3 the automatic calculation "limitation" a term they made up, "At most, the screenshots relate to calculating

streaming royalty payments to music right holders". CH-26 demonstrates the defendant showing **what** (artist)(title) played **where** (country of sale), **tallying** (quantity) and (earnings(usd)), demonstrating their service provides the same automatic calculation feature. This feature is important to make sure artists represented by PROs get compensated properly.

(**This element of the claim 1 and 3 is infringed** because in Spotify automatically calculating royalties receive indication of the performance royalty earned)

1. wherein, the audio signals of the new media are normalized by the processor or the jukebox by applying gain to the signals based on the obtained positive RMS value less than 1, and

3. wherein, the audio signals of the new media are normalized by the processor or the jukebox by applying gain to the signals based on the obtained positive RMS value less than 1, and

CH-28 demonstrates the defendants explaining how (audio gets delivered at different audio levels) and they perform normalization by applying gain, they describe as positive gain and negative gain, we describe it more broadly just calling it gain. Defendant explains in positive gain (explaining "we consider the headroom of the track"). The head room is the difference from the RMS perceived loudness and the peak 1. The defendants demonstrate in CH-29 Normalization involves integrated LUFS. Integrated LUFS is the

measurement of a signal over time and offers a good indication of the perceived loudness of a track. Integrated LUFS is used to determine how to alter a tracks gain. Loudness spectrum analyzation involves RMS to know how apply positive gain or negative gain. Any reasonable person skilled in the art, (audio engineer) understands that if you have an audio track that is peaking the waves get cut off and become square ruining your speakers and sound harsh, if you only turn up or down volume on clipping sound it is remains a clipping sound regardless of volume, and has no effect on the waves inside the safe listening range of -1 and 1 and the signal needs to be normalized .

(**This element of the claim 1 and 3 is infringed** because defendant measures the signal and applies gain to increase or decrease the signal.)

1. wherein, the audio signals of the new media are further compressed for reducing a dynamic range of the signal based on a preset compression ration and a preset threshold value.

3. wherein, the audio signals of the new media are further compressed for reducing a dynamic range of the signal based on a preset compression ration and a preset threshold value.

**Info:** (RMS began to gain prominence in the 19th and early 20th centuries and used long before digital audio even came out. LUFS which stands for Loudness Units Relative to Full Scale, was recently introduced in 2006.)

**Info:** (Deciphering LUFS: Imagine a library. It's generally quiet. But then, someone drops a heavy book. That's a peak sound. Now, imagine the overall loudness of the library throughout the day, considering whispers, rustling pages, and the occasional cough – that's similar to LUFS. It reflects the average loudness level. Technically, LUFS stands for Loudness Units relative to Full Scale. It helps normalize perceptive loudness across different recordings and platforms. Introduced to combat the "loudness wars" where artists aimed for the loudest possible masters, often sacrificing dynamic range and introducing unpleasant distortion. Songs with a good dynamic range (reflected in a wider difference between peak and RMS levels) offer a more engaging and enjoyable experience. A good dynamic range ensures that the quieter parts of your song are actually quiet, allowing the louder parts to stand out and create impact.)

CH-29 Demonstrates defendants audio analysis achieving similar result to the disclosed method. Sage audio further explaining because Spotify measures in RMS, it may adjust signals slightly different than those that measure in LUFS. It should be noted that although Spotify used LUFS targets, it still measured the signal in RMS meaning that some discrepancies may exist between Spotify and other streaming services that use -14 LUFS as a target. Any reasonable person skilled in the art, (audio engineer) understands that if you have an audio track that is peaking the waves get cut off and become square ruining your speakers and sound harsh, if you only turn up or down volume on clipping sound it is remains a clipping sound regardless of volume, and has no effect on the

waves inside the safe listening range of -1 and 1 and you have to consider dynamic range, compression, threshold, as part of mastering audio).

**(This element of the claim 1 and 3 is infringed** because Spotify consider dynamic range, compression, threshold, as part of mastering new media**).**

## Discussion on Possible Confusion Points, Direct and Continued Direct Infringement.

The bar version of the jukebox compares itself closely to **prior art** the (internet jukebox) due to the inventive step, "for new media" and describes many smaller ideas and solutions such as (Solving overhead involved in having to send someone to go in to the bars to collect the money every time the bill acceptor fills up). Any reasonable person understands that a bill acceptor is different that a credit card reader. And any reasonable person understands that there is no need to send anyone to collect money from a bill acceptor if the machine does not have one. Any reasonable person would understand that music use reporting happens on the server when music is streamed regardless of device using it. Any reasonable person would establish that a bill acceptor would not be a practical application for a cell phone jukebox. And any reasonable person would establish that new media steaming to a cell phone still has music use reporting requirements. There is a difference between a venue and an establishment. A venue is a location where something takes place, and establishment is a permanent business location, whereas a public venue serves communities on a broad scale, often accessible

to everyone, contrasting with establishments that may cater to specific clientele or purpose. The PRO licensing compliance for music use reporting has to do with location where use took place since they are territorial performance licesnses. The scope of the invention is on a broad scale allowing musicians a way to get exposure an make money in public venues. The purpose of the PROs and a pro license for public performance is so the artist(right holders) make money when people use their copyrighted works. If apps distributed to the public would not be considered public performance then there would be no need for a pro license. Since the inventive step involves pro licensing from the server of what plays where it is not confined to use in an establishment because the establishment requires an additional license special to establishments, for example Spotify for Business, which are not required for playing on a cell phone. As such we describe music use reporting occurs on the server when media is requested from the server, as opposed to the jukebox reporting to the server to report jukebox money earned so we don't have to go collect dollars out of the bill acceptor. Since the invention was closely compared to the prior art improvements to the prior art are explained but not as to limit the scope of the invention. As such, the claims describe licensing and royalty reporting to PROs which is an essential step for anyone operating legally in the global music space. From the breakdown of the claims, we see these capabilities are offered by the server. Any reasonable software developer skilled in the art understands these capabilities are offered by the server, and that is how they are claimed in the invention.

Of course the defendant can claim to have separated themselves from this responsibility when going from a monolith when they directly infringing between 2018-2019 to a micro-services architecture as they keep continue to directly infringe. As Plaintiff has demonstrated above how Spotify direly infringed all of our independent claim 1 and 3 when Spotify bypassed the distributor and payed artists directly around 2018-2019. (See Exhibit M). We will  demonstrate willful and knowingly how they continue to direcly infringe (to achieve an equivalent result), as it occurs today.

**Discussion on Public Venues**

(Plain Language of the Claims) The term "public venue" in not limited in the claims to be a specific type of location, such as a bar. Instead, the claims consistently describe "public venues" in general terms, suggesting a broad interpretation. For example, Claim 1 discusses a system designed for use in "public venues", with no explicit restriction to bars or nightclubs. The absence of limiting language indicates the intent to include a wide range of publicly accessible locations. (Specification and Embodiments) The patent specification describes the system as a "self-service IT Web 2.0 jukebox method and system," explicitly defined to function in a settings where the general public gathers. While the specification mention bars or restaurant as examples, these are not exclusive, our patent also describes the server side. Courts typically interpret patents to cover all embodiments reasonably supported by the specification, and broad reading of "public venues" aligns with the goal of maximizing exposure and revenue for musicians.

(Purpose of the Invention) The purpose of the invention, as stated in the patent, is to provide musicians with exposure and income opportunities in public spaces. Limiting the term "public venues" to bars alone would undermine   this purpose by excluding other widely accessible locations, such as coffee shops, libraries, retail stores, airports, community centers, gyms, stadiums, and other geological locations around the world. A broader interpretation furthers the inventor's stated objective and aligns with the patent's intended utility. (Contextual Interpretation) The doctrine of claim construction requires interpreting terms in light of their ordinary meaning to a person skilled in the art at the time of filing. To such a person, "public venue" would reasonably mean any place accessible to the general public, including but not limited to bars. Examples in the specifications are illustrative, not exhaustive, and should not unduly narrow the scope. (Judicial Precedents) Courts often hold that claims should be construed to cover their full scope unless explicitly disclaimed. Since the patent does not explicitly restrict "public venues" to bars, interpreting it broadly to include all publicly accessible spaces is consistent with legal principles of patent law.

**Discussion of Request-Response**

In client-server interaction for software applications, the concept of request-response is a fundamental communication pattern. (Client) the client is an application or device that initiates a request to a server. This could be a web browser, mobile app, or any application or server that requires resources or services hosted on a server. (Server) The

server is a device that provides services or resources to client request. It's responsible for processing requests, accessing necessary data, and returning the desired response. (Request) The client sends a request to the server, which is a message or signal indicating that it needs specific data or action performed. (Processing) Upon receiving the request, the server processes it. This process involves routing the request to the appropriate service, possibly interacting with databases, and performing computations on data retrieval based on the clients requirements.(Response) Once the server processes the request, it constructs a response containing the requested data or confirmation of the action performed. This can be in various formats, like HTML, JSON, XML, etc., depending on what the client expects. (Communication Protocol) Both the client and server typically use a well-defined communication protocol for exchanging request and responses. For web application, this is commonly HTTP or HTTPS, which allows for standardized communication over the web. This request-response cycle is the basis for dynamic interactions in applications, enabling clients to receive updated information or services from servers efficiently and reliably. In short client-server also means the server receives a request, the server processes the request, and the server responds, as demonstrated in the independent claims **1** and **3**.

**Discussion of Music Licensing**

To begin, the grantor of the license is also the enforcer who helps the licensee operate legally and provides the instruction on the necessary reporting elements required needed

to be performed for the license. The territorial nature of performance rights organizations (PROs) is closely tied to the enforcement of copyrights, including the ability to take violators to court. (Legal Jurisdiction) Copyright laws are enacted and enforced at the national or regional level. Each country or territory has it's own legal system and copyright regulations. PROs must work with there jurisdictions to enforce rights and manage licenses. (Enforcement of Rights) If someone violates copyright, the rights holders need a legal basis to take action. Operating territory allows organizations to navigate legal systems more effectively to enforce copyrights and protect the interest of operators. (Revenue Collection) PRO's collect royalties for the use of copyrighted works. Licensing on a territorial basis allows for more efficient connection and distribution of royalties according to local usage and market. (Local Representation) By having a territorial focus, PROs can better understand and represent the interest of local authors, composers, and music publishers. They are often more familiar with cultural and business practices of their specific region. (Territorial Licensing Agreements) PROs negotiating licenses for public performance, broadcast, and other uses of copyrighted works within specific regions. These licenses are specific to the territory's language, legal requirements, and market dynamics. (Membership and Affiliations) Many PROs are members of international networks, allowing then to operate beyond their home territory though reciprocal agreements, but their primary function remains tied to the region they directly serve. (Economic Considerations) Copyright markets, like any other

markets, operate differently based on local economic conditions. Territorial licensing allows for tailored approaches that align with these specific economic realities. By maintaining territorial licensing, PROs can ensure effective management and protection of copyrights, catering to the unique needs and legal frameworks of each jurisdiction. In the U.S we have ASCAP, BMI, SESAC, and GMR, and Canada, has SOCAN, and Germany, has GEMA as different venues and territories have different Pros. Since Pro music licensing is territorial through the world, when you obtain permission from the PROs to licensing for popular music you to must report royalties for the territory, which involves automatically calculating **what** played **where** so later on you can file your music use reports and the artists can get paid. Music use reporting has been around since before Plaintiff was born, and may not seem like the inventive step of "new media distribution" that won us the patent, although very new concept with ASCAP calling our web license experimental, the PRO licensing aspect disclosed in patent is the bridge that brought the artists and the music industry together.

**Discussion of Independent Claims 1 and Claim 3**

The 925' Patent only has 2 independent claims. Claim 1, and Claim 3. The two claims are identical, and due to the U.S. Supreme Court decision in Alice Corp. V. CLS Bank International (2014) and the defendants pointed out. Claim 3 is the physical embodiment of claim 1 the spiritual one. Claim 3 mirrors claim 1. (The relationship between the claims) is where, Claim 3 is essentially a different format of claim 1, intended to cover

42

similar subject matter but presented as a computer-readable medium. (The purpose of both claims) is where, Claim 3 was added to ensure that the invention is not seen as an abstract idea and to provide tangible embodiment of the method described in claim 1. (Reference to Claims Chart) The claims chart for claim 1 covers all the inventive aspects that also apply to claim 3, highlighting that the chart for claim 1 is representative of both claims due to their similarity in content and inventive step, and the accompanying explanations apply to both claims. (Note on Redundancies) Since claim 3 mirrors claim 1 in all substantive respects besides the format, a separate chart for the claim 3 would only repeat the same content. (Linking Statement) Claim 1 and Claim 3 are substantively identical regarding the disclosed Inventive concept, differing only to their claim forma; therefore, the detailed claims chart for Claim 1 is applicable and representative of Claim 3 in all discussed aspects.

## Dependent Claim 14 And Meaning Of "Jukebox"

14. The method of claim 1, where in the jukebox is "at least one of" computer device, an internet jukebox, kiosk, set-top box, or cellphone. In the context provided, "jukebox" is a broad term that can refer to multiple types of devices or settings. Specifically, it can encompass the following: (computer device) any computer or similar electronic device capable of playing music. (Internet Jukebox) A jukebox connected to the internet, typically streaming, or downloading music from online sources. (Kiosk) A stand alone setup, often found in public places, used for playing music. (Set-Top Box) A device that

connects to a television and plays music, possibly along with other multimedia. (Cell Phone) A mobile phone with the capacity to play music stored on the device or streamed from the internet. While only five specific types are listed here, the use of "at least one of" implies that "jukebox" could refer to a broader range of devices or configurations that fit withing similar categories or functionalities. Essentially, the term "jukebox" in this claim is used as flexible, encompassing term to adapt to various embodiments, allowing the patent to cover new and evolving technology in the music-playing domain. So in other words our patent for the term jukebox makes it future proof which can encompass any device capable of playing music, for example a smart watch, earbuds, or music lollipops, which is the lollipops where you hear music through your tongue. If Elon's neuralink allowed you to hear music through your brain and he allowed the inventive step of "new media distribution", the digital signal processing and reported to PROs we would be able to extent and invitation to license to him as well.

## Clarification of Automatic Calculation

The focus of the patent is on automatic calculations, not manual ones. This distinction is crucial, as manual calculations in this context would be unreasonable and impractical. The defendant's themselves acknowledge the role of automatic calculations in their royalty reporting process, which aligns with patent's claims. And the defendant also acknowledged in their answer what they understand what we are describing in the screenshot and in our claim 1 the automatic calculation, "At most, the screenshots relate

to calculating streaming royalty payments to music right holders".

**Territorial and Public Nature of Royalties**

Music licensing and public performance rights, such as those handled by PROs like ASCAP and BMI, inherently operate on a territorial basis. Since music performance rights are territorial and public, a territory can be reasonable interpreted as a public venue. The defendants themselves state on their website publishing royalties as, The money owed to songwriter(s) or owners(s) of a composition. These payments are issued to publishers, collecting societies, and mechanical agencies based on the **territory** of usage.

**Parallel Automatic Calculation Process**

The defendant's system of automatically calculating royalties reporting for artist and PROs directly around 2018-2019 when our patent was infringes is admitted by the defendant in  (Exhibit M) today via infringement still happens via distributors mirroring the essence of the patented system. Royalty reporting and Payments to PROs as described by the defendant are based on territorial calculation of public performance. Similarly, the patent describes automatic calculations for (earnings) royalties for artists and venue (territory) where new media was played. Automating territorial royalty reporting to the PROs, what played where, and is supported in the detailed description. "The web service helps to track usage and session tracking **to keep compliance with**

**ASCAP licensing** for popular music." and is described as royalty reporting from the streaming server as opposed from the machine, more on that below.

## Support for Independent Artists and Different Venues

The patent's scope, allows artists to promote to a world wide (as supported by claim 16. The method of claim 1 where the wide are network is the Internet. World Wide Web) audience, and not limited to venues associated with ASCAP or BMI or artist registered with such PRO's. It supports a broader range of artist and venues, including independent ones that operate outside of ASCAP/BMI structures. Services like Spotify demonstrate the feasibility of paying independent artists based on public and territorial performance data, which aligns with the patent's claims, and as demonstrated in our claims chart. Understood and acknowledged in defendant's answer, "At most, the screenshots relate to calculating streaming royalty payments to music right holders".  But we want to make sure we also explain it here to reassure the defendant that they have interpreted it correctly.

## Rebuttal of "Jukebox-Only" Interpretation

The defendant's attempt to narrow the interpretation of the patent to a "jukebox in public venues" overlooks the broader applicability of automatic calculations coming from a streaming server and our supporting claim 14 where a jukebox can mean any device.

The patent clearly accounts for public performance in diverse venues and supports a variety of artist, whether or not they are part of traditional PRO's.

**Rebuttal of "Jukebox-Only" in Venue Interpretation**

Plaintiff having described the existing process of which our local in town jukebox distributor lucky coin described to us was for the bar version of the jukebox, where they place a touch-tunes jukebox in a bar for free and collect 20% of the the top because bar version of jukeboxes require additional licensing (Spotify For Business) type, and split the rest 50/50 with them and the bar owner, because the benefit for a bar owner is to make something for putting their machine in the bar. This by the way is the 50/50 rule of thumb rule which makes something fair that a business man explained to Plaintiff at age of 12. This explanation of money split was for a bar version, of the jukebox, which had a bill acceptor also presented some overhead of having to collecting money from the machine by a jukebox operator or an armored vehicle would have cost a fortune so an idea inside the idea described was to have the machine report what it earned and not have to send someone out to collect the money, as described "This also solves the overhead involved in having to send someone to go into the bars to collect the money each time the bill acceptor fills up"; The patent explains the bar version and preferred method of the jukebox for bars as described from lucky coin, but as time passed and the smart phones started coming out such as the iPhone Plaintiff saw the direction in which things were moving and started supporting many other versions of the jukebox not just

bar or web version, but also a cell phone version, and described android and iPhones and televisions, computers, and really any device following the concept of Java slogan, write once run anywhere. Plaintiff being a Java developer knowing about the concept of write once run anywhere being the Java slogan which means Java code runs across multiple devices, any personal reasonable in the art of Java Web Programming would be agree that a bar version would not be the only intended use. Our supporting claim **14** specifically supports this.

**Rebuttal Of How Royalties Are Distributed**

Additionally, Plaintiff being a digital platform well over a decade is well aware that when digital platforms report to PROs like ASCAP no one knows what artist are making. Global Music Rights being the newest player in PROs space in USA dealing partial licensing is more exclusively represents artists such as Drake to Switch to them and  offering different rates based on their exclusive contracts to switch PROs. Also since anyone with original music can register on ASCAP it can be one in dividual or a group of 80 to 100 from a philharmonic symphony where each member individual musician  registered on ASCAP on one track. Or anyone can become a record studio, record a band and creates a record deal contract and say you want 10% of their royalties in exchange for a free recording. Not one know what kinds of deals anyone has. And royalties are based on number of plays across what is reported on all different listening mediums. As such how royalties are distributed withing the PROs is beyond the scope of

Plaintiff or Defendant, this argument is over 'Patent infringement not over how the industry works.

## Licensing Type Needed To Make Apps

If you are offering a streming service with artist that are represented by the PROs, then you need a Web & App license, and if your streaming app stores and then plays off line or makes a copy you also need an additional, copy right license from Harry Fox as well. Weather you're broadcasting a song over the radio to the public or on an app accessible to the public its still considered a public performance and why you need a license.

## Type of Licensing and Meaning of Venues In Automatic Calculation Step

A commercial type license for a Jukebox in a bar is a specific type of license which comes from the PROs or for convenience the Jukebox Licensing Office JLO combines them (ASCAP, BMI & SESAC), and is a different type of license needed for a music steaming service or music app which is a web & mobile type of license used by Plaintiff and Spotify's where the requirement of music reporting and licensing has territorial meaning and comes from streaming from a service as such the venue interpretation as described in claim 1 with regards to the Automatic Calculation has to do with streaming from a server not from the bar jukebox version. As we are explicitly describing the server and what happened when we stream a song from the server.

The service where the music streams from, requires the PROs type license for web &

mobile type. If you put something in a public business you need also need the additional license, business license akin to the Spottily for Business license. As the Plaintiff patented invention describes both the system which is not the just the machine in a restaurant but the system that provides the streaming service then the description for limiting calculation is one of streaming from a server, and not one of a machine inside a place of business.

The Jukebox Money Earned Table in FIG, 5.8 is specific to the bar type jukebox reporting when a song plays on the that type machine, to report what played on that machine, to prevent from having to collect money from the machine. This interpretation is supported FIG, 5.8 explains that a bar can know how much they owe to pay their balance.

Additionally the claims which explain specifically what happens when a song streams exclusively from server on the server and is decoupled from bar version of the jukebox, as described in the automatic calculation element of claim **1** and any reasonable person would understand that a cell phone jukebox of claim **14** is not the same thing as FIG, 5.8 the bar version that thing weighs a ton, but also has requirements to report royalties, and that streaming music use reporting licensing is territorial. Defendants should not unduly attempt to narrow the scope, as courts often hold that claims should be construed to cover their full scope unless explicitly disclaimed.

**Rebuttal of "Any and All" defendants Remaining Allegations**

When winning a patent for things that are not invented yet, you have to go off of the prior art, meaning the latest thing invented in at the time was the internet Jukebox that has realtime media distribution, but it was not one that was not friendly to allowing local artist participation. There was no "for Artist" jukebox. The "for Artist" came from "realtime media distribution of **new media**".

As such Plaintiff has proven the defendants question about automatically calculation not being a limitation, proving that the defendant has directly infringed each and element of the patented invention in claim 1 and 3 that the defendant mentioned "in order to be successful in proving infringement we must get past this limitation", as such Plaintiff hereby rebuts any un-rebutted remaining allegations, and if there are no remaining matters in dispute Plaintiff still willing to extend and offer a license for the '925 patent to the defendant, for a reasonable and fair licensing deal after can settle on the direct infringement.

## IV. Patent Infringement

Spotify's "Spotify for Artist" program directly infringed the '925 Patent by implementing technology and methods covered by the patent without authorization. Specifically, Spotify practiced each element of all the independent claims by allowing artists to upload and distribute their music via web service, mirroring the patented invention. In 2018, when Spotify announced that artists could directly upload to them and they would pay artist and Pros each and every element of our claim 1 and 3 was infringed, even the

automatic calculation step as they described how artists can bypass the distributors, and they get paid directly and how the artists that are part of PROs can keep 100 percent.

Spotify is directly responsible for the ongoing infringement of '925 patent. By restructuring its business operations to delegate infringing activities to third-party partners. Spotify not only executes a strategy to designed to exploit our patented technology but also remains the central orchestrator and benefactor of these infringing activities. This tactic effectively obfuscates their role, yet it is Spotify's deliberate actions and continuing control over the infringing process that constitutes the core infringement. Thus, Spotify singularly bears the responsibility for violating our patent, rights, negating the need to pursue action against ancillary parties engaged as partners in this infringement.

### Direct infringement in 2018 - 2019

(Claim Interpretation) Our provided claims chart outline each and every independent step was infringed of claim 1, (See Exhibit C), and since claim 3 is the Alice proof version of mirroring claim 1, the provided claims chart can be used for both claim 1 and 3. Our claims chart shows a web version of the jukebox which is supported via our independent claim 14 but claim 14 supports any device. (Evidence of Infringement) The provided (Exhibit H) serves as additional proof of how the claims were infringed and were outlined in detail in the provided claims chart. The defendant's arguments that they do not pay artists or pros or perform calculations of royalties is rebutted. The Automatic

calculation of royalty payments described in the '925 patent was directly infringed by Spotify in 2018 and described by defendant as "Spotify clarified that artists who directly upload their music will receive 50 percent of Spotify's net revenue <u>(the service will also account to publishers and collection societies) and will keep 100 percent of royalties on that music</u>. (See Exhibit M). The '925 patent claim supports paying independent artist and PRO's which reporting is territorial based on what plays and where it plays. (Infringing Activities) The direct infringing activities (allowing artists to upload directly, calculating royalties, and paying artist direct or indirectly through pros) occurred withing the '925 patents term.

## Continued Direct Infringement

Spotify has knowledge of out patent and is aware that their current actions continue to infringe. Today Spotify knowingly and willingly continues to infringe the '925 patent through it's current implementations where by going from a monolith architecture a micro services architecture does not change the underlying result of infringing all the steps of in the independent claims 1 and 3 of the '925 patent. Their website states that you can no longer upload to Spotify for Artist directly so they don't infringe, demonstrates that they have knowledge of the continued infringement.

## Doctrine of Equivalence

Even though Spotify for Artist changed their system architecture from monolith to micro

services the underlying function, way, and result of the service is substantially the same. Splitting the architecture does not alter the functionality in a meaningful way as it still achieves the patent claims objectives. Just because Spotty for Artist has the artist create their artist profiles upload their media to their partners sites, regardless of where the artist profile is creates and where the music is processes or who does the calculations for royalties in the the end the calculations are still performed and so in the end the service still achieves the equivalent patent claims objectives.

### V. Demand For Relief for DIRECT Patent Infringement

WHEREFORE, Plaintiff Manuel Tijerino moves this Honorable Court to enter an  Order of Judgement against Spotify USA Inc. as follows:

A judgement that Spotify willfully and directly infringed the '925 Patent from 20 September 2018 to the 31 July 2019, totaling 315 days total, when they allowed artist to directly upload to their platform.

A preliminary and permanent injunction preventing Spotify from any further or future acts of direct infringement in the absence of a license.

Royalties for past direct infringement, calculated as 5.3% of Spotify's annual gross revenue during that time.

Given Spotify's average annual revenue in 2018 $6.1 billion, and in 2019 $7.56 billion with recent years reaching $15.65 billion, this amount reflects a reasonable royalty based

on the value of the patent.

Damages, including interest and costs.

Licensing Price $1,000,000 million a day.

Calculated Damages:

Direct Infringement in 2018, from 20 September 2018 to 31 December, 103 days.

Reported Annual Earnings for 2018 was 6.1b.

Calculated Daily Earnings in 2018: 6.1b  divided by 365 is 16.71 million per day.

Licensing Calculation Percent: 16.71m per day calculated at 5.98% is 1 million per day.

Estimated Licensing 1m a day: 103 million for 2018 at 5.98% of annual gross revenue.

Direct Infringement in 2019, from 1 January 2019 to 31 July 2019, 212 days.

Reported Annual Earnings for 2019: 7.56 billion

Calculated Daily Earnings in 2019: 6.1b divided by 365 is  21.64 million a day.

Licensing **Discount** Percent: 21.64b per day calculated at 4.62% is 1 million per day.

Estimated Licensing 1m a day: Only 212 million for 2019 at 4.62% of annual gross revenue.

Discounted Rate (2018-2019): 5.3%

Estimated Licensing Fee: 315 million averaging 5.3%.

Willful Patent Infringement(3x multiplier): 945 million total.

Accrued Interest 5%: 55 million: total $1,000,000,000.00

Inflation (7% since 1929) : 70 million total $1,070,000,000.00

An award of monetary damages of 1.07B, one billion seventy million 1,070,000,000 and zero cents.

## V. Demand For Relief for Continued Direct Infringement

WHEREFORE, Plaintiff Manuel Tijerino moves this Honorable Court to enter an Order of Judgement against Spotify USA Inc. as follows:

A judgement that Spotify has continued to infringe the '925 Patent using the principles of the doctrine of equivalence.

A preliminary and permanent injunction preventing Spotify from further acts of continued infringement in the absence of a license.

Royalties for past infringement, calculated as 5% of Spotify's annual gross revenue. Given Spotify's average annual revenue of $10 billion, with recent years reaching $15.65 billion, this amount reflects a reasonable royalty based on the value of the patent.

Damages, including interest and costs.

## VI. Historical Background & Congressional Research

Tijerino, creator of check1two.com since 2001, is a pioneer in creating media

networks for independent artists with "user provided content" and real-time media distribution for promoting any artists, holding priority over our original patent filed in 2007, with such innovations that predate the launch of significant technological advancements like the iPod launched in 2001, and the iPhone launched in 2007.

Spotify, launched with familiar user experience like iTunes, but was different in the sense where rather than (buy download play) like iTunes who focused on selling downloads, Spotify allowed streaming via curated playlists, backed by licensing agreements from major labels. Apple later made their own streaming service Apple Music, as seen in the congressional research service report, Money for Something Music Licensing in the 21st Century, page 2 attached as exhibit A, which says,...

"In 2003, after negotiating licensing agreements with all of the major record labels, Apple Inc. launched the iTunes Music Store to provide consumers a legal option for purchasing individual songs online. The year 2012 marked the first time the recording industry earned more from retail sales of digital downloads ($3.4 billion in 2019) than from physical media such as compact discs, cassettes, and vinyl records ($3.1 in 2019 billion dollars). Apple had approximately a 65% marker share of digital music downloads. Apple peaking in 2012, however, sales from digital downloads began to decline, as streaming services such as Spotify, which entered the U.S. market in 2011, became more popular. Facing a mounting threat to its iTunes Music Store, Apple launched its own subscription streaming music service, Apple Music, in 2015."

The congressional research report shows us a few notable things, such as the direction of how the music industry shifted and the familiar notion of similar competitive products where one company Spotify makes as music streaming service and then Apple makes their own music streaming service, Apple Music. This is natural occurrence in business that has been there in most other industries, however, in the music world, particularly with regards to media distribution, we have now arrived into the era of the, "for Artists" which is defined in our granted patent.

On 29 September 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,146,(925) entitled "User Defined Jukebox Kiosk Set Top Box", to Manuel Tijerino. A true and correct copy of the '[925] Patent' is attached as Exhibit B.

Spotify's platform infringes our '925 Patent please see as Exhibit C'. Prior to the USPTO granting out patent, all of our claims were denied on the grounds that the concepts we presented had all ready existed; Our patent examiner mentioned it was obvious to track any statistics for jukebox usage, plays, or royalty distribution (Exhibit D), and that real-time media distribution all ready existed in traditional digital internet jukeboxes and where by uploading media to a server to update a jukebox via a distribution lists existed and updating newly connected jukeboxes via distribution lists all ready provided real-time music distribution. (Please See Exhibit E). We spent approximately 8 years working with the US patent office before winning our patent for

being useful, novel, and non obvious. The specific thing which helped us win the patent was that the real-time media distribution relating to 'New Media' which empowered artists to promote themselves. We essentially created a new industry and the existing industry has shifted in our direction. The "New Media" distribution is what allowed the artists to publish their own music giving artists a chance to earn royalties when their "New Media" is played, changing the music industry as we know it today.

When Spotify launched as a streaming music service, they did it with music licenses from labels and curated content, as opposed to "user provided content". In 2013 Spotify took a significant steps as a music distribution platform that supported artist and businesses (Please see Exhibit F). These actions, contributed to their growth and popularity as a platform. Spotify's "for Artist" first launched explaining how, Artists had to go through labels to get on the platform (Please see Exhibit G). Spotify "for Artists" provided Artists information of what was to come and kept making improvements, however. in September 20th 2018 it was announced that Spotify now allowed artist to upload their music to the platform; whereby allowing 'New Media' distribution infringing our '925' patent (Please see Exhibit H). The things needed to offer real-time distribution of "New Media" described in our patent are essentially providing something "for Artists" so they can distribute their "new media" and make royalties when their "new media" plays somewhere, which aligns with the industry standards by the (Performance Rights Organizations) PROs. (Please see Exhibit I). Despite having

knowledge of our pending patent since Java One in 2009 (Please see Exhibit J) both of us having worked with Sun Microsystems the creators of the Java programming Language, Spotify who initially described themselves as a 'virtual jukebox', launched as a streaming music service, who later became a music distribution service "for Artist" whereby infringing our '925 'patent in 20 September 2018, and since then, has continued to infringe causing significant harm to the Plaintiff. According to a Google Search, Spotify's net worth is 68.85 billion as of August 30, 2024, and after taking significant steps to properly identify infringement of our '925' patent, we have sent Spotify invitation emails to license, in 11 July 2024 (Please see Exhibit K). Spotify finally replying to our follow up email reminder from 13 August 2024 stating that they acknowledge receipt of the email and the attached correspondence and are reviewing the materials provided, but have not given any further substantively response, promoting this action. As we have not heard back from Spotify since last month, we respectfully file this complaint with the Eastern District Court, confident in an efficient resolution of this matter by extending a license of our '925 patent to Spotify.

## VII. Anti-Competitive Allegations

In addition to infringing our patent, I would also like to bring up anti-competitive allegations. It has been mentioned by the creator of Spotify, that the idea for Spotify came after Napster was shut down, which Napster despite being the wolds most popular P2P file sharing service at one time, and said to have almost destroyed the music

industry, was shut down by the Recording Industry Association of America (RIAA) and several major labels (Sony, Universal, Warner, BMG) in the case A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th  Cir., 2001) and also by Metallica in Metallica v.Napster, Inc. Napster where the co-founder, Sean Parker, who also happened to be the first President of Facebook and the first President of Spotify. Parkers invested 15 million USD into Spotify. Parker being an influential connection between the two companies Facebook and Spotify; helping Spotify dominate the market, while our adds would get denied, constitute an anti-competitive nature. Not only was our technology copied but we were blocked from competing and deliberately targeted with malicious scams (Please See Exhibit L).

Finally, I would also like to give a simple example to understand licensing, there is a fine line between legal and illegal. Gaming and Gambling is the same thing but Gaming is legal and Gambling is illegal. What is the difference? A license. Whereby, seeking an amicable decision for a fair licensing deal so Spotify can operate legally, and as direct and proximate result of Spotify's infringement, Plaintiff has suffered and will continue to suffer monetary damages in amounts to be proven at trial but no less than a reasonable royalty.

## VIII. Prayer for Relief for Anti Competitive Allegations

WHEREFORE, Plaintiff Manuel Tijerino respectfully moves this Honorable court to enter an  judgment Order against Spotify USA Inc. as follows:

1. Spotify has infringed the independent claims 1 and 3 from the '925 Patent'.

2. An order requiring Spotify to take a license for the '925 Patent' on mutually agreeable terms, but no less than a reasonable royalty;

3. An award of damages in the form or royalties, including backpay from the time of infringement, sufficient to compensate Tijerino for Spotify's infringement, including prejudgement and post-judgement interest.

4. A preliminary and permanent injunction preventing Spotify from further acts of infringement in the absence of a license.

5. Award treble damages as allowed by law; up to three times the amount of damages as permitted under 35 U.S.C. § 284.

6. A declaration that this case is exceptional, and an award cost, interests and attorneys' fees pursuant to 35 U.S.C 285.

7. Grant any other relief as the Court deems just and equitable.

## IX. EXHIBITS

1. EXHIBIT A - Congressional Research Report Music Industry Shifting

2. EXHIBIT B - '925 Patent

3. EXHIBIT C - Claims Chart Demonstrates Patent Infringement

4. EXHIBIT D - USPTO Previously Denying Claims Due To Obviousness

**5.** EXHIBIT E - USPTO Previously Denying Claims Due To Novelty

**6.** EXHIBIT F - New 2013 Developments In Spotify To Support Artists

**7.** EXHIBIT G - Artist Must Use Old Methods To Add Music To Spotify

**8.** EXGIBIT H - 2018 Spotify Infringes '925 Patent Uploads

**9.** EXHIBIT I - Pro Licensing Requirements For Digital Music Providers

**10.** EXHIBIT J - Java One 2009 Demo

**11.** EXHIBIT K- Invitation To License

**12.** EXHIBIT L - One Of Many Anti-Competitive Targeted Scams

**13.** EXHIBIT M - 2018 Spotify Directly Infringes '925 Royalties

Respectfully submitted,

*Manuel Tijerino*

_____

28 January 2025
MANUEL TIJERINO, *Pro Se*
2141 Leslie Street, Gretna, LA 70056
515-803-8907
**ManuelTijerino@Hotmail.com**